UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

JAKE C. GAITER,                    )
                                   )
        *Plaintiff*,                )
                                   )   Case No. 4:06-cv-47
v.                                 )
                                   )   Judge Mattice
AEROSPACE TESTING ALLIANCE, et al. )
                                   )
        *Defendant*.                )

## MEMORANDUM AND ORDER

Plaintiff Jake Gaiter brings this action against Defendants Aerospace Testing

Alliance, Sverdrup Technology, Inc., Computer Sciences Corporation, and General Physics

Corporation (collectively the "Defendants") alleging causes of action for wrongful discharge

based upon race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e-2(a); disparate treatment based on race in violation of Title VII, 42 U.S.C.

§ 2000e-2(m); wrongful discharge based on age in violation of the Age Discrimination in

Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a); and wrongful termination based

on race in violation of the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-

21-401. Before the Court is the Defendants' Motion for Summary Judgment [Court Doc.

No. 29]. For the reasons explained below, Defendants' Motion for Summary Judgment is

**GRANTED**.

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Id.* at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II.    FACTS

The Arnold Engineering Development Facility ("AEDC") is an United States Air Force facility that performs engineering testing on aircraft, rockets, and other defense systems. (Plaintiff's Deposition [Court Doc. 29-1] 17-18.) Aerospace Testing Alliance ("ATA") is a civilian contractor at AEDC that provides operation, maintenance, information, management, and support services. (Defendant's Answer [Court Doc. No. 3] ¶ 2; Pl.'s. Dep. at 25.) ATA is a joint venture between Defendants Jacobs Sverdrup, Computer Sciences Corporation, and General Physics. (Def.'s Answer ¶ 2.)

Jake Gaiter worked for ATA as an ironworker. (Pl.'s Dep. at 15, 26-27.) Gaiter worked in the Facilities O&M Department, or FA for short. (Pl.'s Dep. at 30-31.) During the time period at issue in this case, Gaiter's immediate supervisor was Windy Cunningham. (Pl.'s Dep. at 28-29.) David Eldridge was Cunningham's supervisor and Gaiter's branch manager. (Pl.'s Dep. at 29-30.) Bert Coffman was the director of the FA department and Richard Oliver was deputy director of FA. (Eldridge Deposition [Court Doc. 29-5] 48; Oliver Deposition [Court Doc 29-6] 6.)

As an ironworker, Gaiter often worked at significant heights. (Pl.'s Dep. at 24-25.) ATA provided its employees with numerous types of safety training, including classes on fall prevention. (Pl.'s Dep. at 37; Record of Safety Instruction received by Plaintiff [Court Doc. 29-7].) ATA's fall protection guidelines required all employees who were working over six feet off of the ground to be "tied-off". (Pl.'s Dep. at 37-38, Cunningham Deposition [Court Doc. 29-4] 46-47, Oliver Dep. at 16-17.) Gaiter had received fall protection training from ATA and was aware of ATA's policy requiring anyone working more than six feet off the ground to be tied-off. (Pl.'s Dep. 37-39.)

In November 2004, Gaiter was on the ground assisting a co-worker who was working more than six feet off the ground but was not tied off. (Pl.'s Dep. at 43-44.) Oliver observed this behavior and met with both men to discuss ATA's fall protection policy. (Oliver Dep. at 12-14.) Gaiter questioned Oliver, noting that his co-worker, who was over six feet tall and working only just over six feet above the ground, would not have been helped by tying off with his six foot long lanyard. (Pl.'s Dep. at 44-45.) Oliver left the meeting with a feeling that Gaiter had a poor attitude toward safety and fall protection. (Oliver Dep. at 23.) From this point on, Gaiter believed that Oliver had it in for him because he was black and because he had "questioned [Oliver's] logic." (Pl.'s Dep. at 42-47.)

In January 2005, Gaiter was seen by Oliver sitting on top of a large frame that was elevated more than six feet off of the ground; Gaiter was not tied-off. (Pl.'s Dep. at 55-56; Oliver Dep. at 14-15.) Cunningham, Eldridge, Oliver, Gaiter, and a union representative held a meeting later that day to discuss Gaiter's safety violation. (Pl.'s Dep. 60, 63; Cunningham Dep. at 21; Oliver Dep. at 19.) Gaiter had never previously been counseled by management at the level of Eldridge and Oliver. (Pl.'s Dep. at 32.)

At the meeting, various disciplinary options were discussed, including placing Gaiter on a written performance plan or suspending him. (Cunningham Dep. at 21-23; Oliver Dep. 19-20.) Gaiter did not consent to either option. (Cunningham Dep. at 22.) Oliver then told Gaiter that the next time he was found to have violated the fall protection policy, it would "be serious" and he could possibly be terminated. (Cunningham Dep. at 22-23.) Gaiter left the meeting thinking that another violation would get him "three to four months off from work"; he did not believe that he would be terminated. (Pl.'s Dep. at 66, 69-70.)

On March 8, 2005, Richard Eichel, an ATA safety team member, saw Gaiter working over six feet off the ground without being tied off. (Pl.'s Dep. at 82-83; Eichel Declaration [Court Doc. No. 32] ¶ 4.) Gaiter was standing on the mid-rail of a lift and sitting on the top-rail, both violations of ATA safety guidelines. (Eichel Decl. ¶ 4; Aerial Work Platforms Policy [Court Doc. No. 29-12].)

Eichel contacted Cunningham and Oliver to report Gaiter's fall protection violation. (Eichel Decl. ¶ 7.) Oliver and Cunningham met with Gaiter and his union representative to discuss the incident. (March 8, 2005 Memo. to File [Court Doc. No. 29-13].) Gaiter admitted that he had violated the fall protection policy. (*Id.*)

Eldridge, as Gaiter's branch manager, was tasked with making a recommendation on discipline. (Eldridge Dep. at 26.) Eldridge recommended that Gaiter be terminated because Gaiter's actions were unsafe and because Gaiter had been warned only two months earlier of the serious nature of violating ATA's fall protection policy. (Eldridge Dep. at 27-28, 44, 50-51.) Eldridge's recommendation was forwarded to the director of facilities operation and management, B.U. Coffman. (Coffman Memorandum (March 9, 2005) [Court Doc. No. 29-12].) Coffman met with Oliver and Eldridge as part of his review process. (Oliver Dep. at 29-32.) Following his investigation, Coffman concurred with Eldridge's recommendation of termination. (Coffman Memo. (March 9, 2005).) Thomas Quatrini, an employee in ATA's human resources department, also conducted an investigation into Gaiter's safety violation and recommended termination. (Quatrini Declaration [Court Doc. No. 30] ¶ 1-5, 12-15.)

Ultimately, the decision to terminate Gaiter was made by David Elrod, ATA's general manager. (Elrod Decl. [Court Doc. No. 31] ¶ 7.) He reviewed all of the relevant information

and made the decision to terminate Gaiter's employment.  (*Id.*)  Gaiter was terminated on March 10, 2005.  (Termination Letter (March 10, 2005) [Court Doc. No. 29-15].)

## III.    ANALYSIS

In Gaiter's response to Defendant's Motion for Summary Judgment [Court Doc. No. 36], he abandons his claims under the ADEA and the THRA.  The only claims remaining are Gaiter's racial discrimination claims for wrongful discharge and disparate treatment under Title VII.

Because there is no direct evidence of discriminatory intent in this case, Plaintiff's discrimination claim must be analyzed under the familiar *McDonnell Douglas*/*Burdine* burden-shifting analysis.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1972).  Under this analysis, the burden first falls to Plaintiff to establish a *prima facie* case of discrimination by showing that (1) he was a member of a protected class, (2) he was discharged, (3) he was qualified for the position he held, and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated person outside the protected class.  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992).  If Plaintiff is able to make this showing, the burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination.  *Mitchell*, 964 F.2d at 584.  If Defendant is able to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination, the burden then shifts back to Plaintiff to produce evidence from which a jury could find that Defendant's stated reason is actually a pretext for discrimination.  *Mitchell*, 964 F.2d at 584.

In the case at bar, ATA concedes that Gaiter has established a prima facia case of discriminatory discharge. Likewise, Gaiter concedes that ATA has articulated a legitimate, non-discriminatory reason for terminating his employment. The disposition of this case thus hinges upon Gaiter's contention that the justification proffered by ATA was a pretext for racial discrimination.

Once the defendant has proffered a legitimate, nondiscriminatory basis for dismissal, an employer's explanation can not be rejected "unless there is sufficient basis *in the evidence* for doing so. To allow the jury simply to refuse to believe the employer's explanation would subtly, but inarguably, shift the burden of persuasion from the plaintiff to the defendant." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). A Plaintiff can refute an employer's proffered basis for discharge by showing that it: (1) had no basis in fact, (2) did not actually motivate the decision to terminate the plaintiff, or (3) was an insufficient basis to warrant the plaintiff's termination. *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 576 (6th Cir. 2006); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Under the first and third methods of showing pretext, the finder of fact "may infer discrimination from the circumstances." *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 589 (6th Cir. 2002). The second method of showing pretext requires the plaintiff to introduce some further evidence of discrimination.[1] *Id.*

Gaiter admits that he violated ATA's fall protection guidelines in March 2005 by standing on the mid-rail and sitting on the top rail of the lift. (Pl.'s Dep. at 77, 79-80.)

---

[1]     This rule applies only when, as here, the plaintiff does not factually challenge the defendant's proffered reason for dismissal. *Manzer v. Diamond Shamrock Clems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1997).

Gaiter also admits that, two months earlier, he violated the fall protection guidelines by working more than six feet off the ground without being tied-off. (Pl.'s Dep. at 52-54.) Thus the first potential method of challenging an employer's explanation - contesting its factual basis - does not apply here.

A.    *Similarly Situated*

The bulk of Gaiter's pretext argument revolves around his contention that white employees were treated differently than he was for similar safety violations. (Memorandum in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment ("Pl.'s Resp.") [Court Doc. No. 35] 9-10.)

A plaintiff can rebut an employer's legitimate, nondiscriminatory basis for termination by showing that "other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 084 (6th Cir. 1994). "To be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct *without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it*." *Hardy v. Eastman Chemical Co.*, 50 Fed. Appx. 739, 742 (6th Cir. 2002) (emphasis in original).

Gaiter alleges that numerous ATA employees who committed similar safety violations were not terminated for their actions. (Pl.'s Resp. at 9-10.) One such employee drove a crane into an overhead telephone cable, knocking the cable to the ground. (Pl.'s

Resp. Ex. 8.)  Two ironworkers were in a truck following, and supposedly guiding, the crane.  (Pl.'s Resp. Ex. at 33.)  All of these employees were white.  (Pl.'s Resp. Ex. 7.)  Each of the three employees was suspended for three days and their supervisor received a counseling statement.  (Pl.'s Resp. Exs. 8, 9, 10; Eldridge Dep. at 35.)  The incident was the first safety violation for each of these employees.[2]

Gaiter also argues that he is similarly situated to C.D. Jones, a white employee who violated ATA's smoking guidelines.  (Pl.'s Resp. at 10.)  Jones was verbally counseled for his first violation and received a written warning for his second violation.  (Jones Letter (December 5, 2003) [Court Doc. No. 35-11].)  Two months later, he was again observed violating the smoking guidelines and was suspended for five days.  (Jones Letter (March 3, 2004) [Court Doc. No. 35-12].)  One year later, Jones was again suspended for five days, this time for wrecking a government vehicle.  (Jones Letter (May 3, 2005) [Court Doc. No. 35-13].)

Gaiter's argument fails because similarly situated employees must have been subject to the same standards of conduct. *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003).  Gaiter was terminated for violating ATA's fall protection policy; the "comparable" incidents did not involve the fall protection policy.  The violations were not judged under the same standards of conduct and these employees, therefore, are not similarly situated to Gaiter.  *See Braithwaite v. Timken Co.*, 258 F.3d 488, 496 (6th Cir.

---

[2]     Gaiter points out that these employees had acknowledged taking the crane through the intersection on other occasions. (Pl.'s Resp. at 10; Eldridge Dep. at 34-38.)  However, the act of taking the crane through the intersection was not, in and of itself, a safety violation. (Eldridge Dep. at 33-35.)  Eldridge stated that these employees were disciplined for "negligence" because they did not watch ahead, see the potential obstruction, and make an overt action to stop the crane so that they could check the clearance. (*Id.*)

2001) (finding that employee disciplined under both rules eight and sixteen was not similarly situated to employees disciplined only under rule eight); *Gray v. Toshiba America Consumer Products*, 263 F.3d 595, (6th Cir. 2001) (finding that plaintiff was not similarly situated to employees who were disciplined under a prior version of the same rule).

There is extensive evidence in the record showing that ATA considers fall prevention a top priority. (Elrod Declaration [Court Doc. No. 30] ¶¶ 2-3, Cunningham Dep. at 42-44, Oliver Dep. at 83-84.) This Court can not sit as a "super personnel department" and instruct ATA to treat violations of its smoking and crane operation policies as seriously as it treats violations of its fall protection policy. *See Young v. Sabbatine*, 238 F.3d 426, 2000 WL 1888672, *6 (6th Cir. 2000). The incidents to which Gaiter attempts to analogize the circumstances that led to his discharge involved neither substantially identical conduct, nor were they decided under the same standards. That the comparative events were also "safety violations", meaning some harm could have come to the offending employee, does not mean that the participants in such events were similarly situated. *See Alfrey v. AK Steel Corp.*, 211 Fed. Appx. 393, 396 (6th Cir. 2006) (finding that two plaintiffs who were involved in similar vehicle accidents in violation of company policy were not similarly situated because plaintiff was fired for failure to report his accident and there was no suggestion that the other employee failed to report).

Gaiter also claims that he is similarly situated to two white employees in the FA department, Meeks and Merriman, who were suspended for three days for violating ATA's fall protection policy by working twenty feet off the ground without a safety harness. (Pl.'s Resp. Exs. 7, 14, 15.) It is undisputed that this incident was the first such violation for both Meeks and Merriman. (Oliver Dep. at 37-38; Pl.'s Resp. at 9-10.)

Meeks and Merriman were disciplined for violating ATA's fall protection policy by not being tied-off at a height greater than six feet. (Pl.'s Resp. Exs. 14, 15.) They were therefore subject to the same standards under the fall protection policy and were engaged in substantially identical conduct. *See Alfrey v. AK Steel Corp.*, 211 Fed. Appx. 393, 396 (6th Cir. 2006).

But there is a significant distinguishing factor. An employee disciplined for a first offense is not similarly situated to an employee who has been previously warned by management for a prior violation of the same rule.[3] *Morton v. United Parcel Service, Inc.*, 1666 Fed. Appx. 779, 782 (6th Cir. 2006) (plaintiff who was disciplined for two safety violations at the same time was not similarly situated to an employee who was disciplined for one violation and then another violation of the same rule nine months later). It is undisputed that it was the first offense for both Meeks and Merriman. Neither employee was specifically on notice that they would be punished severely for a violation of the fall protection policy. *See Gray*, 263 F.3d at 601 (finding that plaintiff who was specifically warned by management that she could be terminated for violating a particular rule was not similarly situated to an employee who violated the same rule but had only constructive notice through the company rules of the possible repercussions for a violation). Gaiter was not, therefore, similarly situated to Meeks or Merriman.

---

[3] This Court also notes that it appears from the record that Meeks and Merriman were not disciplined by the same supervisor. Both men have disciplinary letters in their employment file that are signed by "R.E. Thomas, CEO/Facilities Maintenance". (Pl.'s Resp. Ex. 14, 15.) Mr. Thomas does not appear to have been involved in the decision to terminate Gaiter. (Eldridge Dep. 22-23, 30-31.) In order to be similarly situated, the employees who were not fired must have been disciplined by the same supervisor. *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003). However, this factor does not form a basis for the Court's holding because it has not been briefed by the parties and there are other bases for finding that Gaiter is not similarly situated to Meeks and Merriman.

Gaiter has not provided an example of a similarly situated employee who was treated differently by ATA. He has therefore not met his burden of producing evidence that would allow the jury to find that ATA's proffered basis for dismissal was pretextual.

B.     *Statistical Evidence*

Statistical evidence can be used to show that a defendant's proffered reason for dismissal was pretextual. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 592 (6th Cir. 2003) (stating that plaintiff may show pretext through "direct, circumstantial, or statistical evidence"). But such statistical evidence must be "cast against a proper background (e.g., qualified applicants, industry or geographic norms) to constitute valid evidence of discrimination." *Felder v. Nortel Networks Corp.*, 187 Fed. Appx. 586, 595 (6th Cir. 2006).

Gaiter claims that ATA's employee demographics database shows that ATA "engaged in a practice of clustering black employees together so that they could be more closely monitored." (Pl.'s Resp. at 8.) He supports this argument with statistics showing the distribution of black employees within his work unit. Gaiter worked in FA-82, which was encompassed in a larger department called FA. (Oliver Dep. at 6.) In FA-82, twenty percent of the workforce was black but in FA overall, only seven percent of employees were black. (Pl.'s Resp. at 8; Demographics Database [Court Doc. No. 35-7].) Thus, while FA-82 accounts for only nine percent of FA's total population, FA-82 accounts for twenty-four percent of its black employees.

First, Gaiter does not provide enough relevant background information for this Court to conclude that ATA does engage in a practice of clustering black employees. Gaiter does not provide evidence about how the various units within FA are delineated. Perhaps

FA-82 is the only unit that employs ironworkers. Without more information, this Court can not determine whether Gaiter, or any other black employee, could properly be placed outside of FA-82. Overall, Gaiter has not provided the information necessary for this Court to adequately analyze and put into context the statistics provided.

Nevertheless, this Court must consider the statistics in a light most favorable to the plaintiff at this stage in the litigation. Thus, for argument's sake, this Court will *assume* that ATA engaged in a practice of clustering black employees.[4] Even were that the case, the statistics on placement of black employees have little relevance as to whether Gaiter was terminated for a safety violation or because of his race. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000) (granting summary judgment for failure to show pretext because statistics relating to the percentage of minority supervisors were not relevant to the issue of whether the plaintiff was terminated because of his race."). *See also Kier v. Commercial Union Ins. Cos.*, 808 F.2d 1254, 1258 (7th Cir. 1987) (holding that statistical evidence relating to the employer's hiring practices is irrelevant in discriminatory discharge case); *Box v. A&P Tea Co.*, 772 F.2d 1372, 1379-80 (7th Cir. 1985) (statistics showing that employer favored men in promotions had little relevance to claim that employer discriminated because of sex in disciplinary actions).

Gaiter's statistical evidence is not beneficial for this Court's pretext analysis. Gaiter has not produced statistics showing that, due to their being "more closely monitored," employees in FA-82 have been cited for more safety violations than other divisions. Gaiter

---

[4] The Court does not mean to suggest by this assumption that it has determined that ATA does indeed have practice of clustering black employees or that it would condone any such policy. On summary judgment, this Court must view the facts in a light most favorable to the plaintiff, and this Court's statement regarding plaintiff's allegations of clustering black employees is made in that vein.

has not produced evidence that FA-82 employees were terminated at a higher rate due to the increased surveillance. Gaiter alleges that the "benefits" of ATA's clustering of black employees were apparent in November 2004 when Oliver observed Gaiter assisting a fellow employee who was in violation of the safety regulations. (Pl.'s Resp. at 8, 3) But both parties acknowledge that during the November 2004 incident, Gaiter was merely assisting and was not himself violating any safety procedures.  (Pl.'s Resp. at 3, Memorandum in Support of Defendants' Motion for Summary Judgment ("Def. Br.") [Court Doc. No. 29-2] 6.) Moreover, evidence of one incident where Oliver observed Gaiter's work practices does not establish a pattern of increased surveillance.  Overall, Gaiter has not shown how any "clustering" of black employees by ATA adversely affected him or how this supposed policy made it more likely that ATA's decision to terminate his employment was discriminatory rather than for his repeated safety violations.

In general, Gaiter's statistical evidence is not enough to allow a jury to conclude that ATA's proffered reason for dismissal was pretextual.  Although it is possible that these statistics could show an intent to cluster black employees, Gaiter has not shown a negative impact of this practice. The proffered statistical evidence cannot, therefore, sustain plaintiff's burden at this stage in the litigation.  *See Macy v. Hopkins County Sch. Board of Ed.*, 484 F.3d 357, 370 (6th Cir. 2007) (affirming summary judgment because a jury could conclude that the statistics were evidence of prejudice "only by filling in the details with speculation.")

If Gaiter's claim was that he had been wrongfully transferred or wrongfully assigned to FA-82, perhaps these statistics would be more compelling.  *See Marsh v. Eaton Corp.*, 639 F.2d 328 (6th Cir. 1981) (statistics showing that company was funneling women into

lower paying jobs were sufficient to make a *prima facia* case for sex discrimination). But Gaiter's claim is for wrongful discharge. The statistics provided by Gaiter do not provide a sufficient basis for a jury to conclude that ATA's proffered reason for dismissal was pretextual. *C.f. Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 593 (6th Cir. 2002) (court denied summary judgment based, in part, on plaintiff's statistics about other discharged employees offered to show pretext and found that the statistics showed "some proof that the defendants had a pattern of hiring and firing that adversely affected older employees.")

C.     *Deviation from Discipline Procedures*

Gaiter also argues that ATA's preferred reason for dismissal is pretextual because the March 2005 safety violation was not "the most serious first-time infraction" and, therefore, it was an insufficient basis for dismissal under ATA's Employee Conduct and Discipline Policy ("discipline policy"). (Pl.'s Resp. at 7-8.)

ATA's discipline policy provides for five potential levels of disciplinary action: formal counseling (verbal), written warning, final written notice, suspension without pay, and termination. (ATA Management System Policy [Court Doc. No. 35-7] 2.) The policy states that ATA "may use progressive discipline" but that "[a]ctions do not have to be progressive, depending on the severity of the initial or subsequent infraction(s)." (*Id.* at 1-2.) Termination can be used in three instances: "for the most serious first-time infractions, as a part of progressive discipline, or when other means of redressing the employee's conduct have failed." (*Id.* at 2.)

Gaiter alleges that ATA's dismissal can be based only on the March 2005 incident because the January 2005 violation and the briefing that followed were not documented

in his file.  (Pl.'s Resp. at 7.)  Section 5.4 of the discipline policy states that "[a] record of the same or similar infractions in the recent past is valid basis for imposing a more severe discipline."  (Pl.'s Resp. Ex. 6 at 2.)  Based on this, Gaiter argues that because there is no record of the January 2005 incident, the disciplinary policy does not allow its use as a "basis for varying disciplinary actions."

The Court concludes, however, that this provision of the discipline policy does not mean that ATA was required to disregard the January 2005 safety violation altogether. Section 5.1.5 of the discipline policy states that termination may be used "when other means of redressing employee's conduct have failed." (*Id.* at 1.)  Termination on this basis is not a variance from the discipline policy and therefore Section 5.4 does not apply.  ATA was therefore justified in considering the January 2005 safety incident, and the counseling that occurred subsequent to that incident, in determining that, under Section 5.1.5, other means of addressing Gaiter's propensity to violate the fall protection policy had failed.

Moreover, even were the Court to accept Gaiter's argument that ATA could consider only the March 2005 safety violation in its discipline determination, ATA's decision to terminate Gaiter was appropriate under the terms of the discipline policy.  The discipline policy states that termination may be used "for the most serious first-time infractions." (*Id.* at 2.)  There is a multitude of evidence in the record showing that ATA considers fall prevention a very serious issue. (Elrod Decl. ¶¶ 2-3, Cunningham Dep. at 42-44, Oliver Dep. at 83-84).  Gaiter admitted that ATA provided extensive safety training and repeatedly informed employees about the fall protection guidelines.  (Pl.'s Dep. at 34-35.)  ATA specifically notes that the only two safety related deaths at the AEDC facility occurred when prior employees were not tied-off when working at heights.  (Elrod Decl. ¶ 3.)

Even viewed in the light most favorable to the plaintiff, the evidence shows that ATA places a heavy emphasis on fall prevention. ATA claims that "[g]iven the danger that working at height presents to its employees . . ., Plaintiff's engaging in an unsafe act by standing on the mid-rail and sitting on the top rail of an extended lift is manifestly sufficient" to justify Gaiter's termination. (Def.'s Br. at 19.) Title VII was not intended to "diminish traditional management prerogatives." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981). Nor is this Court a "super-personnel department." *Young v. Sabbatine*, 238 F.3d 426, 2000 WL 1888672, *6 (6th Cir. 2000). Thus, the Court cannot conclude that Gaiter has presented adequate evidence to allow a jury to conclude that his March 2005 safety violation was not the true reason for his dismissal.

D. *Oliver's Racial Animus*

Underlying all of Gaiter's arguments is the theory that Oliver, one of Gaiter's superiors at ATA, was out to get him. Gaiter alleges that Oliver "grew angry that he was corrected by a black employee" and that "Oliver began following Gaiter around the jobsite waiting for an opportunity to catch Gaiter in a compromising situation." (Pl.'s Resp. at 8-9.) Gaiter argues that "Oliver used his position of authority to influence Eldridge to recommend termination prior to the meeting with Bert Coffman." (*Id.* at 9.) He also alleges that, at the meeting with Coffman discussing the possibility of Gaiter's dismissal, "Oliver presented a picture of repeated violations and Eldridge's recommendation to cover over the true motivation for the action." (*Id.*)

Before a court can consider whether a supervisor's bias was evidence of discrimination, the plaintiff must show that the supervisor was "meaningfully involved" in

the adverse employment decision at issue. *Leonard v. Twin Towers*, 6 Fed. Appx. 223, (6th Cir. 2001) ("[T]o survive a motion for summary judgment, a plaintiff must do more than prove that another employee was biased against him. He must also provide sufficient evidence that would allow a rational jury to conclude that the decision to fire him was based on a discriminatory animus.")

Gaiter must show not only that Oliver was biased against him but also that Oliver was "meaningfully involved" in the termination decision. Gaiter's March 2005 safety violation was observed and reported by an ATA safety inspection team. (Eichel Decl. ¶ 4.) Oliver learned of the violation from Richard Eichel, an ATA safety specialist. (*Id.* at ¶ 7.) Oliver and Eldridge then had a meeting with Gaiter on March 8, 2005 to discuss the incident. (Oliver Dep. at 29-32.) As Gaiter's immediate supervisor, Eldridge was tasked with making the initial disciplinary recommendation. (Eldridge Dep. at 24, 32, 48-49.) He recommended that Gaiter be terminated. (*Id.*)

Eldridge's recommendation was forwarded to the director of facilities operation and management, B.U. Coffman, for review. (Def. Br. Ex. 14.) Coffman met with Oliver and Eldridge as part of his decision-making process. (Oliver Dep. at 29-32.) At that meeting, Oliver expressed his belief that "something needed to happen that would effect a change." (Oliver Dep. at 32.) Following his investigation, Coffman concurred with Eldridge's recommendation of termination. (Def. Br. Ex. 14)

Thomas Quatrini, an employee in ATA's human resources department, also conducted an investigation into Gaiter's March 2007 safety violation and recommended termination. (Quatrini Decl. [Court Doc. No. 30] ¶ 1-5, 12-15.) The only mention of Oliver in Quatrini's review was that he participated in the March 8 meeting with Gaiter.

-18-

Ultimately, the decision to terminate Gaiter was made by David Elrod, ATA's general manager. (Elrod Decl. [Court Doc. No. 31] ¶ 7.) He reviewed all of the relevant information, again only mentioning Oliver as having participated in the March 8 meeting, and made the decision to terminate Gaiter's employment. Gaiter was terminated on March 10, 2005. (Termination Letter [Court Doc. No. 29-15].)

On summary judgment, the Court must view all facts in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). Oliver was involved in the termination decision through his participation in the March 8 meeting with Gaiter and by meeting with Coffman prior to Coffman's recommending termination. Construing all facts and inferences in favor of Gaiter, it is possible that a jury could find that Oliver was meaningfully involved in Gaiter's termination. *See Wells v. New Cherokee Corp.*, 58 F.3d 233, 237-38 (6th Cir. 1995) (holding that the immediate supervisor was a decision-maker despite the fact that he lacked authority to independently terminate plaintiff because he consulted closely with the ultimate decision-maker regarding the decision to terminate plaintiff);

Nevertheless, Gaiter has not presented adequate evidence that Oliver's bias against Gaiter was racially motivated. For this Court's purposes, the fact that Oliver was "out to get" Gaiter is irrelevant unless Oliver's animus was driven by Gaiter's race.

None of Gaiter's allegations of Oliver's racial animus cite to evidence before the Court. Besides Gaiter's own subjective belief that Oliver was watching him because he was black, there is no evidence in the record suggesting that Oliver was biased against black employees. There is no evidence of Oliver using racial slurs. There is no evidence

that Oliver had previously targeted other black employees. Gaiter admitted that Oliver did not say anything racially derogatory or use racially hostile words in his vicinity. (Pl.'s Dep. at 47-49.) Instead of presenting objective evidence of racial animus, Gaiter claimed that he just had a feeling or intuition that Oliver did not like him because he was black and "you have to be black to have this feeling." (Pl.'s Dep. at 249-50.) *C.f. Johnson v. Kroger Co.*, 319 F.3d 858, 866-67 (6th Cir. 2003) (denying summary judgment because plaintiff had offered evidence indicating that reason for dismissal was pretext including statements made by a manager regarding the effect a black employee would have on the company's business and had instructed other employees to stop telling racist jokes).

Gaiter's unsupported allegations of Oliver's racial animus are not enough to meet his burden at this stage in the litigation. *Adams v. Tennessee Dep't of Finance and Administration*, 179 Fed. Appx. 266, 274 (6th Cir. 2006) (finding that plaintiff failed to produce sufficient evidence from which a jury could reasonably reject the employer's proffered basis for dismissal because the plaintiff offered only his own depositions, affidavits, and e-mails in support of a claim of racial animus).

Because Gaiter has not presented sufficient evidence to establish that the reason proffered by ATA for Gaiter's termination was a pretext for discrimination, Gaiter's Title VII claims for wrongful discharge and disparate treatment must be dismissed.

**IV. CONCLUSION**

For the reasons explained above, Defendants' Motion for Summary Judgment is **GRANTED**. The above-captioned case is **DISMISSED WITH PREJUDICE**.

SO ORDERED this 19th day of September, 2007.

_____/s/Harry S. Mattice, Jr._____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE